**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM D. SPILLANE,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **AXA FINANCIAL, INC.** | : | |
| **t/a AXA EQUITABLE** | : | |
| **LIFE INSURANCE COMPANY, *et al.*** | : | **No. 08-2151** |
| **Defendants.** | : | |

**MEMORANDUM**

**Schiller, J.** **July 22, 2009**

William Spillane filed a complaint in the Chester County Court of Common Pleas against AXA Equitable Life Insurance Company (AXA); Financial Planning Directions, Inc.; and James Hughes. The Complaint alleged breach of contract, fraudulent and negligent misrepresentation, bad faith, and unfair trade practices stemming from Defendants' discontinuation of disability insurance payments to Spillane. The Complaint was removed because Defendants contend that this Court has jurisdiction under the Employee Retirement Income Security Act (ERISA). Following two previous motions to remand, an amended complaint, discovery on the applicability of ERISA, and a change of counsel for Plaintiff, Plaintiff filed the motion to remand now before this Court. For the reasons that follow, the Court concludes that ERISA applies and therefore denies the motion.

## I. BACKGROUND

In March of 1988, Spillane was the President of David M. Spillane Company (sometimes referred to as "the Company"). (Am. Compl. ¶ 6.) Around that time, Defendant James Hughes, acting as an agent for AXA's predecessor in interest, sold Spillane a disability insurance policy ("the

Policy"). (*Id.* ¶ 7.) Spillane resigned as President of the Company in 1998 because he was no longer able to withstand the physical rigors of the position; nonetheless, he remained with the company as a consultant throughout 1998 and 1999. (*Id.* ¶¶ 8-9.) Spillane started a new business in January of 2000, and because he was able to earn enough money in his new position between 1998 and 2005, Spillane never applied for benefits under the disability insurance policy. (*Id.* ¶¶ 10-11.) However, on a number of occasions – both before and after leaving the David M. Spillane Company – Spillane confirmed with Hughes that he was covered under the Policy. (*Id.* ¶ 12.) Because Hughes assured Spillane that he was covered, Spillane continued to pay annual premiums to AXA. (*Id.* ¶¶ 13-14.) In July of 2005, Spillane's physical condition worsened and left him unable to maintain his prior level of activity. (*Id.* ¶ 15.)

The Policy provides that AXA will pay Spillane a monthly income if a disability starts while the Policy is in force and continues beyond the Elimination Period. (*Id.* ¶¶ 20-21.) According to Spillane, he "began Total Disability" in 1998 because he was no longer able to continue as President of the Company. (*Id.* ¶ 25.) Nonetheless, because he was not under the regular care of a doctor between 1998 and 2005, he was not able to recover under the Policy. (*Id.* ¶ 26.) Since July 20, 2005, Spillane has regularly been under the care of a doctor. (*Id.* ¶ 18.) Spillane submitted a notice of claim under the policy around January 10, 2006 and AXA paid benefits for the period from October 25, 2005 through January 25, 2006 but thereafter stopped making payments under the Policy. (*Id.* ¶¶ 27, 29.)

According to AXA's Notice of Removal, Plaintiff's Complaint, which included claims for breach of contract, fraudulent and negligent misrepresentation, bad faith, and unfair trade practices, presented an action for disability benefits governed by ERISA and thus involved a federal question.

(Notice of Removal ¶¶ 2-3, 9.) On June 5, 2008, Plaintiff filed a motion to remand, but on June 25, 2008, this Court approved a stipulation whereby Plaintiff withdrew his motion to remand and agreed to file an amended complaint. Thereafter, Plaintiff filed his Amended Complaint, which raised the same claims and named the same parties as the complaint filed in state court but included, in the alternative, two claims under ERISA and also named the David M. Spillane Company Disability Insurance Plan in the event that ERISA applied. Subsequently, Plaintiff's attorney filed a motion to withdraw as counsel, which the Court granted on October 29, 2008. Plaintiff was able to secure another lawyer and the Court conducted a Rule 16 Conference on January 29, 2009. Nothing happened in the case until the Court issued a Rule to Show Cause why the case should not be dismissed for failure to prosecute. That prompted another motion to remand. On April 20, 2009, the Court denied the motion without prejudice and allowed the parties discovery limited to the issue of whether ERISA covered the Plan. Following discovery and in accordance with that Order, Plaintiff filed the motion to remand now before this Court.

## II. STANDARD OF REVIEW

The law grants subject matter jurisdiction to the federal district courts over "all civil actions arising under the Constitution, law, or treaties of the United States." 28 U.S.C. § 1331 (2009). A defendant may remove a civil action that could have originally been brought by the plaintiff in federal court. *See* 28 U.S.C. § 1441(a) ("any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants . . . ."). As the parties in this case are not completely diverse, this Court has subject matter jurisdiction – and Defendants therefore can remove – only if Plaintiff's Amended Complaint

presents a federal question. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). When the basis of removal is federal question jurisdiction, the propriety of the removal rests on whether plaintiff's well-pleaded complaint raises claims that arise under federal law. *Id.* If federal law creates the cause of action, subject matter jurisdiction is undeniable. "One corollary of the well-pleaded complaint rule developed in the case law, however, is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987). ERISA is one such area. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208-09 (2004).

A defendant bears the burden of showing the existence of federal jurisdiction. *See Pullman Co. v. Jenkins*, 305 U.S. 534, 540 (1939); *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990). "Because lack of jurisdiction would make any decree in the case void and continuation of the litigation in federal court futile, the removal statute should be strictly construed and all doubts should be resolved in favor of remand." *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir. 1995); *see also Brown v. Francis*, 75 F.3d 860, 864-65 (3d Cir. 1996).

## III. DISCUSSION

ERISA "protect[s] . . . the interests of participants in employee benefit plans and their beneficiaries . . . by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Davila*, 542 U.S. at 208. ERISA comprehensively regulates employee welfare benefit plans that, through the purchase of insurance or otherwise, provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death. *Viechnicki v.*

*Unumprovident Corp.*, Civ. A. No. 06-2460, 2007 WL 433479, at *2 (E.D. Pa. Feb. 8, 2007) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44 (1987)).

**A. Whether the Policy is Governed by ERISA**

ERISA applies to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce." *Deibler v. United Food & Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (quoting 29 U.S.C. § 1003(a)). An "employee welfare benefit plan" or "welfare plan" is a "plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . benefits in the event of sickness, accident, disability, death or unemployment . . . ." 29 U.S.C. § 1002(1). Hence, a disability insurance policy is covered by ERISA if it is obtained through: (1) a plan, fund, or program; (2) that is established or maintained; (3) by an employer; (4) for the purpose of providing benefits; (5) to its participants or beneficiaries. *Viechnicki*, 2007 WL 433479, at *3 (citing 29 U.S.C. § 1002(1)); *see also Stone v. Disability Mgmt. Servs., Inc.*, 288 F. Supp. 2d 684, 688 (M.D. Pa. 2003). Whether a plan is an ERISA plan is a question of fact to be determined from the point of view of a reasonable person and in light of the surrounding facts and circumstances. *Deibler*, 973 F.2d at 209.

*1. Plan, fund, or program*

In the Third Circuit, a "plan, fund, or program" under ERISA is established if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Deibler*, 973 F.2d at 209; *see also Smith v. Hartford Ins. Group*, 6 F.3d 131, 136 (3d Cir. 1993).

The Policy is a disability insurance policy in which Spillane is the named insured. According

to the Policy, he was to receive a monthly income of $5,000 in the event that he became disabled. (Pl.'s Mot. to Remand Ex. B [Policy].) The Policy's Notice of Claim provision requires that "[w]ritten notice of [a] claim [ ] be given within 30 days after a covered loss starts or as soon as reasonably possible" and provides that notice can be given to the home office of the insurance company or an agent. (*Id.*) The Policy states that "[b]enefits will be paid to you," with "you" defined in the Policy as the insured, William Spillane. (*Id.*)

Spillane contends that when he purchased the Policy, he was an officer, employee and part owner of the Company. (Pl.'s Mot. to Remand Ex. D [Spillane Aff.] ¶ 2.) At the same time that Spillane applied for the Policy, Joseph McNichol, Vice President and co-owner of the David M. Spillane Company, also purchased a disability insurance policy virtually identical to that of Spillane and in which McNichol was the named insured. (Def.'s Resp. to Pl.'s Mot. to Remand Ex. D [Def.'s Resp.] [McNichol Policy].) Although Spillane acknowledges that McNichol "also purchased disability insurance from the same company," Spillane argues that he made the decision on his own and that he was free to purchase a policy from another insurance company or go without disability insurance. (*Id.* ¶ 2.) Furthermore, according to Spillane, the Company served only as the mailing address for Spillane as the policy holder and that, on some occasions while he was still with the Company, premiums were paid out of the company account for his convenience. (*Id.* ¶ 3.)

Spillane's suggestion that McNichol's purchase of a disability insurance policy was merely a coincidence is not borne out by the record. Spillane, the President of the Company, and McNichol, the Vice President, were co-owners of the Company and completed applications for disability insurance on the same day with the same insurance company using the same agent. The Agent's Reports completed for Spillane and McNichol noted that the policies for both men were issued with

a volume discount and stated that "*clients* adopting split dollar disability income." (Def.'s Resp. to Pl.'s Mot. to Remand Ex. A [Spillane Application] & Ex. C [McNichol Application] (emphasis added).) Additionally, McNichol's affidavit suggests that he and Spillane acted in concert when the men "purchased our own individual policies of disability insurance from the Equitable Insurance Company, to protect ourselves in the event that one of us would be unable to perform our duties." (Pl.'s Mot. to Remand Ex. E [McNichol Aff.].) Thus, it appears as though multiple policies that covered a class of employees were purchased, which is "substantial evidence" that a plan, fund, or program exists. *Stone*, 288 F. Supp. 2d at 689-90 (citing *Wickman v. Nw. Nat'l Ins.*, 908 F.2d 1077, 1083 (1st Cir. 1990)). Furthermore, the requirement of a class of beneficiaries can be met even if only a single employee is covered. *Tannenbaum v. Unum Life Ins. Co. of Am.*, Civ. A. No. 03-1410, 2006 WL 2671405, at *3 (E.D. Pa. Sept. 15, 2006) (citations omitted).

Based on the evidence before this Court, a reasonable person can readily discern the intended benefits, the class of beneficiaries, and the procedures for receiving benefits.

Spillane contends that the Policy is not an ERISA plan because Spillane himself, not his employer, funded the premiums. Although Spillane concedes that "[t]he source of funding of a few payments were advances made by the Company," he asserts that these advances were considered compensation and reflected as part of his personal income on which he paid income taxes. (Pl.'s Mem. of Law in Support of Mot. to Remand [Pl.'s Mem.] at 5.) Additionally, Spillane argues that the Company never maintained a disability benefit plan, did not provide disability policies to employees, and did not maintain a plan administrator or trustee. (*Id.* at 6.) Although the parties may contest the significance of whether premiums paid by the Company were included as compensation to Spillane, all that is required to satisfy this prong is that the source of funding can be identified.

*See Tannenbaum*, 2006 WL 2671405, at *4 ("The source of funding may be the employer, the employee, or a combination of both.") (quoting *Grimo v. Blue Cross & Blue Shield of Vt.*, 899 F. Supp. 196, 202 (D. Vt. 1995)). Because a reasonable person can readily ascertain that the premiums were paid in part by the Company and in part by Spillane, this prong is satisfied.

This Court concludes that Spillane's disability insurance policy qualifies as a plan, fund, or program.

*2. Established or maintained by employer*

The Court must also determine whether the David M. Spillane Company established or maintained the plan, fund, or program. "The disjunctive nature of the 'established or maintained' language appearing in the statute suggests that a showing of either one is sufficient to give rise to ERISA's application." *Cowart v. Metro. Life Ins. Co.*, 444 F. Supp. 2d 1282, 1293 (M.D. Ga. 2006). Courts should focus on the employer and its involvement with the administration of the plan. *Stone*, 288 F. Supp. 2d at 690 (citing *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 978 (5th Cir. 1991)). Although no single act necessarily constitutes the establishment of a plan, "if an employer does no more than purchase insurance for her employees, and has no further involvement with the collection of premiums, administration of the policy, or submission of claims, she has not established an ERISA plan." *Stone*, 288 F. Supp. 2d at 690 (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)). However, the purchase of insurance by an employer is strong evidence that the employer has established or maintained the plan under ERISA. *Viechnicki*, 2007 WL 433479, at *3.

Spillane admits that on multiple occasions the Company collected and remitted the premium for him and McNichol. Indeed, the record reveals that, as late as 1995, checks from the Company were used to pay the premium. (Def.'s Resp. Ex. G [Premium Check].) Furthermore, Spillane and

McNichol requested on their applications that premium notices be mailed to the David M. Spillane Company, which provides further evidence that the employer established or maintained the plan. *See Keenan v. Unum Provident Corp.*, 252 F. Supp. 2d 163, 167 (E.D. Pa. 2003) (noting that bills sent by insurance company to employer "further confirm" finding that employer established or maintained plan). These facts warrant a finding that the employer established or maintained the plan. *See Tannenbaum*, 2006 WL 2671405, at *5; *see also Stone*, 288 F. Supp. 2d at 691 (finding employer established or maintained plan in part because employer "received the statement bill and then remitted payment for the shareholders' policies each month").

Despite strenuous objections from Spillane that the Company merely fronted him premiums occasionally, the record reflects that Spillane and McNichol were adopting "split dollar disability income" insurance. According to the underwriting policy, under a "split dollar" disability arrangement, "the employer and the employee share the premium payments." (Def.'s Resp. Ex. E [Underwriting Policy].)

The Court concludes that the "established or maintained" prong is met.

*3. For the purpose of providing benefits*

The next question is whether the plan established or maintained by the employer was intended to provide a benefit. The fact that a split dollar arrangement was used is evidence that the Company meant to provide a benefit to Spillane. The volume discount Spillane received is further evidence of a benefit. *See Viechnicki*, 2007 WL 433479, at *4 (citations omitted); *see also Keenan*, 252 F. Supp. 2d at 168 (finding that discount on premiums by virtue of participation constituted benefit). Additionally, the fact that the policies were purchased together provides further proof that the Company established or maintained them. *See Cowart*, 444 F. Supp. 2d at 1293 (citing *Donovan*,

688 F.2d at 1373). Moreover, a reasonable person could conclude (and McNichol did conclude) that for the good of the Company, it would be wise for Spillane and McNichol to purchase disability insurance. Thus, the benefits requirement is also met.

*4. To its participants or beneficiaries*

To be governed by ERISA, there must be evidence that plaintiff was a participant or beneficiary in the employee welfare plan. ERISA defines a "participant" as an employee who is eligible to receive a benefit from an employee benefit plan. 28 U.S.C. § 1002(7). A "beneficiary" is one who is designated by the terms of an employee benefit plan, who may become entitled to a benefit thereunder. *Id.* § 1002(8). Spillane admits to having been an employee of the Company and clearly participated in the plan under the definition in ERISA; therefore this prong of the test is satisfied.

Although Plaintiff contends that the Company did not maintain or provide disability insurance for its employees, at least two employees of the Company – Spillane and McNichol – were the intended participants in the disability insurance program. The requirement that a class of beneficiaries be present for a plan under ERISA to be established can be satisfied even though only one employee participated in the plan. *See Tannenbaum*, 2006 WL 2671405, at *3 (citations omitted); *see also Cowart*, 444 F. Supp. 2d at 1292 (finding plan existed though offered to only three employees). Given that Spillane and McNichol applied for similar benefits at the same time "to protect [themselves] in the event that [either Spillane or McNichol] would be unable to perform [their] duties," one could easily conclude that they were the intended class of beneficiaries.

**B. Safe Harbor Regulations**

Spillane did not place all of his eggs in the ERISA statutory basket. He also argues that, even

assuming Defendants can establish an ERISA-governed plan, the "Safe Harbor" regulations promulgated by the Department of Labor exempt the disability insurance policy from ERISA. The Safe Harbor regulations clarify the definition of "employee welfare benefit plan" and "welfare plan" and exempt certain policies from those definitions. A plan is not an employee welfare benefit plan if:

> (1) No contributions are made by an employer or employee organization;
> (2) Participation [in] the program is completely voluntary for employees or members;
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j). "All four factors must be met for a plan to fall within the regulation's safe harbor." *Weinstein v. Paul Revere Ins. Co.*, 15 F. Supp. 2d 552, 557 (D.N.J. 1998).

Turning to the first factor, if an employer pays for a premium, then it has contributed. *Stone*, 288 F. Supp. 2d at 691 (citing *Morris v. The Paul Revere Ins. Group*, 986 F. Supp. 872, 880 (D.N.J. 1997)). Furthermore, an employer has contributed to an ERISA plan if it provided its employees a benefit that they could not receive as individuals. *Brown v. The Paul Revere Life Ins. Co.*, Civ. A. No. 01-1931, 2002 WL 1019021, at *7 (E.D. Pa. May 20, 2002).

The evidence before the Court indicates that the employer and employee shared the premium payments based on the split dollar arrangement set up for Spillane and McNichol. The evidence – uncontroverted by Plaintiff – is that the policies were issued with a volume discount, with the reasonable inference being that the discount was offered only because Spillane and McNichol were

grouped together. Courts have concluded that such a discount qualifies as a benefit that renders the Safe Harbor inapplicable. *See Stone*, 288 F. Supp. 2d at 692; *see also Tannenbaum*, 2006 WL 2671405, at *7-8; *Brown*, 2002 WL 1019021, at *10.

Spillane suggests that, although the Company advanced a few isolated premium payments, these advances were part of Plaintiff's compensation included on his W-2s and, accordingly, Spillane paid income tax on the advances. According to Spillane, this arrangement was "nothing more than a rather routine sort of commingling of accounts, within the context of a close corporation such as David M. Spillane Company, and, although discouraged as a practice, are of little legal consequence for most purposes." (Pl.'s Mem. of Law in Support of Mot. to Remand at 6.) Plaintiff asserts that the Safe Harbor applies when the employee declares the premium payments as income. (Pl.'s Mem. at 8 (citing *B-T Dissolution, Inc. v. Provident Life and Accident Ins. Co.*, 175 F. Supp. 2d 978 (S.D. Ohio 2001).) Unlike in *B-T*, Plaintiff offers no documentation to back up this assertion; Defendants, however, provided evidence that "the employer and employee share the premium payments," indicating that not all of the money used to pay the premiums belonged to Spillane. Furthermore, the discount provided to Spillane – a factor that does not appear to be present in *B-T* – further evidences that the Company contributed to an ERISA plan.

Although the Court provided the parties ample time to conduct discovery on the applicability of ERISA, Plaintiff has merely put forth the affidavits of Spillane, McNichol, and Pamela Grassano, the Office Manager for the David M. Spillane Company. These affidavits all state that the Company sometimes advanced premiums to Spillane and McNichol. Spillane provides no tax returns or other documents to support his allegations. But, to determine whether an employer has paid within the meaning of ERISA, a court should consider the behavior of the parties at the time of the payment,

not later self-serving allegations. *Stone*, 288 F. Supp. 2d at 691 (citing *Morris*, 986 F. Supp. at 880-81; *see also Cowart*, 444 F. Supp. 2d at 1287, 1290-91 (rejecting claim that plaintiffs were ultimately responsible for premiums despite their claim that premiums were taken into account when determining salaries because plaintiffs failed to produce documentary evidence). With only his say-so to the contrary, the uncontroverted evidence is that on a number of occasions, the Company paid the premiums. *See Cowart*, 444 F. Supp. 2d at 1291. Furthermore, as late as March 5, 1995, a check from the David Spillane Company was made payable to AXA's predecessor-in-interest, Equitable, for Spillane's premiums. (Premium Check.) The fact that Spillane's employer continued to pay premiums seven years after the policy was purchased belies the notion that the Company acted as an occasional facilitator and mail-drop for Spillane to be able to pay his premiums. And although Spillane argues that he always reimbursed the Company the exact amount advanced for the premiums, such advances still constituted an interest-free loan that amounted to a contribution to the plan. *See Stone*, 288 F. Supp. 2d at 692.

Spillane points to a case from the District of Oregon to support his contention that the Safe Harbor regulations apply here. (Pl.'s Mem. at 8 (relying on *Rubin v. Guardian Life Ins. Co. of Am.*, 174 F. Supp. 2d 1111 (D. Or. 2001).) In *Rubin*, however, the Court examined only the applicability of the third factor, the neutrality of the employer with respect to the program. The court concluded that the employer's willingness to provide employees with a discount for purchasing disability insurance could not "in and of itself" be construed as an endorsement. *Rubin*, 174 F. Supp. 2d at 1119. But here, the contribution factor is established, thus the Court need not address the neutrality factor.

Based on the above, the Court concludes that the Company contributed to the plan and the

Safe Harbor is therefore not applicable.

## IV. CONCLUSION

The Court concludes that Spillane's disability insurance policy is governed by ERISA. Plaintiff's motion to remand is therefore denied. An appropriate Order will be docketed.